And we have one argued case today, and that is docket number 23-2331, Oliva v. Department of Veterans Affairs. Mr. Kazem, you've reserved three minutes for rebuttal, is that right? Yes, Your Honor. Okay. Please begin when you're ready. All right. Good morning, Your Honors, and may it please the Court, Appellate Jad Kazem on behalf of Stephen Oliva. Or, Jad Kazem on behalf of Stephen Oliva. This is a whistleblower retaliation case, and this appeal seeks to vindicate a whistleblower's right to a board proceeding that addresses all the relevant evidence, and to an agency investigation that collects even basic information from the employee. Let me ask you a question right at the outset, because the government in its brief says this is only a whistleblower case, and you're not challenging the underlying dismissal. I read the A.J.'s opinion as dealing with both issues. Are you challenging both issues? We're very much challenging the underlying specifications, but we're doing so under the clear and convincing framework, under the CAR framework, because we've established a prima facie case. I understand. Did you understand the A.J. to be addressing both issues, in her opinion? I understood the A.J. to be addressing the specifications under preponderance standard, and then also the whistleblower defense under clear and convincing.  Right. But our focus, again, is on clear and convincing, because it's not enough for the agency just to show preponderance here to remove a whistleblower. It's the agency's burden to show clear and convincing evidence justifying removal. Right. But to the extent that the issue was focused initially, at least, on the sufficiency of the evidence to warrant the dismissal, setting aside the affirmative defense, then it would be correct for the A.J. to talk about the evidence under the preponderance standard, correct? But the A.J. analyzed, in the first instance, the evidence in the preponderance standard, but then went on. You know, the next step is clear and convincing. Okay. And, you know, it's not enough for the government under Miller just to have some evidence or even preponderance of evidence to justify removal.  Clear and convincing. And this is key because, look, Smith v. GSA, this Court's recent decision, made clear that the clear and convincing evidence standard requires the Board to provide a, quote, in-depth review and full discussion of the relevant facts to explain its reasoning without ignoring the evidence relevant to the whistleblower's defense. And likewise— So do you agree that the A.J. does not have to address every piece of evidence, in her opinion? I—look, I agree. My—or our position is that the A.J. has to address certainly every material piece of evidence. And, you know, in addition to that— The A.J. does not have to address every piece of evidence, in her opinion. I think every material piece of evidence. It doesn't have to be every stray. Can you answer my question, yes or no? Whether or not you agree that the A.J. does not have to address every piece of evidence, in her opinion, yes or no? We agree with that, Your Honors, that the A.J. doesn't have to address every stray theory or every stray. But these are, you know, material pieces of evidence. This is the core defense theory that was advanced, you know, with respect to we had a high-performing employee here, not just for—or a high-performing manager, not just performance-wise, but also his branch had the highest employee satisfaction rates as well. He was sent to an underperforming— Regarding CAR Factor I, what is your best argument to support that the Board's decision is not supported by substantial evidence? With respect to CAR Factor I, our position is that the A.J. failed to address material evidence including the—again, the core defense theory here, which is the character evidence. We had an employee who—a manager who had top both customer satisfaction ratings for veterans, but also employee satisfaction ratings in his office. He was sent to an underperforming— Did he ask to have character witnesses presented before the A.J.? He had before the A.J., but the A.J. didn't address that evidence until the— She listed the appellant's witnesses. I don't see where she foreclosed any of his witnesses. Which witnesses and where would I find the list of witnesses in the record that she prevented him from calling? Right. Well, for example—and again, the standard is not just exclusion of witnesses, although here she excluded the lead investigator, the A.J., but also failure to address it in the opinion because, again, Whitmore was very clear and Smith— Could you respond to Judge Bryson's question? Right. So, for example, the Baker Affidavit at Appendix 283 noting that the—Mr. Oliva had the highest success rates in the agency for employee satisfaction and customer satisfaction. Appendix 637— Mr. Baker, this affidavit was submitted to, as I understand it, submitted to the AIB. Is that correct? It was submitted in connection with the removal process, but it was also admitted—it was also part of the evidence of record. Right, but my question is, you say that she didn't allow him to present his witnesses. Which witnesses did she not allow him to present after he made an effort to have them testify? Right. The only witness—the key witness that was excluded here was the lead investigator, which under Whitmore— I thought that originally the lead investigator—are you talking about Russell? Dr. Russell. I thought that Dr. Russell was initially on appellant's witness list, but then decided that they didn't want to call Dr. Russell. They didn't want to call Dr. Russell. Is that accurate? If you look at the record, the reference was that it was—the counsel was—excuse me, Dr. Russell was withdrawn after a pre-hearing conference where the AJ, Judge Maloof, made clear that the AIB was not relevant to the whistleblower defense, which is error under Whitmore. So did your client ask to have Dr. Russell withdrawn, yes or no? In the lower court proceedings, yes, but the basis for the AJ's discretion—the AJ did not say, because we filed a withdrawal, we're not going to— And then the AJ, if I understand it correctly, invited each side to consider the possibility of making a request again to have Dr. Russell appear in the proceeding. Is that right? That's correct, Your Honors. So—and he didn't take advantage of that offer? Yeah. I'd say, look, there's an even simpler path here. It sure sounds like he's waived his right to have Dr. Russell testify. Initially, he said he wanted him, and then he withdrew him, and then he says, well, I withdrew him because the AJ didn't really want to hear from him. But then she makes this offer. If you want to re-urge the approval of any witness, including in particular Dr. Russell, she's open to reconsideration, and there isn't a peep from him. Your Honors, I think there's even a simpler path here. You're right. You're correct about that, which is that the deposition transcript of the AJ—excuse me, of the lead investigator was indisputably in the record, and the government says—and, you know, that deposition transcript of the lead investigator is significant because he, you know, Dr. Russell makes criticisms of the WPA-protected activity between Oliva and the director. The AJ also has a lot—excuse me, the lead investigator in his deposition transcript at Appendix 326 where he talks about Oliva, and he talks about, you know, the 23-minute interview he was given. And the investigator says, quote, whether he was asked or not—this is about the allegations against him—whether he was asked or not, I don't think is particularly germane because my sense is he just would have denied it. And that prejudgment of guilt, that deposition testimony was indisputably in the record. And the government, their only answer for that is to say, well, presumably the AJ considered it. We know the AJ didn't consider it because the AJ, one, didn't address it anywhere in her opinion. Two, at trial she said, I don't think the lead investigator is relevant. The only reason that deposition transcript— But when we were talking previously, counsel, you can't necessarily equate the fact that something isn't stated means that the AJ didn't consider it. We agreed previously, and you agreed with me, that you don't have to talk about every piece of evidence in the decision. I think the relevant standard is the one articulated in Smith and in Whitmore, which is, quote, that the board is required to provide an in-depth review and full discussion of the facts to explain its reasoning. And likewise, the AJ— I suppose the AJ could have written a 200-page opinion, but what we do have here is what appears to be on all accounts. I mean, we've seen a lot of board decisions and AJ decisions, a very careful, thoroughly considered opinion. And so we can give some latitude to this AJ and other AJs when they might not address every single thing. Apparently, there were a lot of things to consider here. Yeah. And I would point, Your Honors, to Siler, for example, the Siler v. EPA decision, where the board—where the court made a point, look, the AJ went through a very detailed opinion, several pages in its car analysis, and we're not necessarily questioning all the findings. But the court said there's, you know, one—there's an important defense theory that the whistleblower raised that was not addressed, and that should be addressed on remand. And if I could just add briefly, Your Honors, look, the government half a dozen times in its briefs invokes a presumption that the board is—or invokes a presumption that the board is presumed to have considered even evidence that was not discussed in its decision. And the authority for that, if you look at it, Your Honors, is Strickland-Donald. And I think that's significant because it was— So then— Go ahead. You know, there's a lot going on in your briefing. There's a lot of different individual arguments. Can you just focus in on one or two pieces of evidence that you want to highlight for us today that the administrative judge did not expressly consider that you really think are vital? Just one or two. I'm happy to boil it down, Your Honors. Yes. And if I may, you know, address with respect to each of the car factors. On car factor— I'm sorry. I just need an answer right now to my question. What is the one or two pieces of critical evidence that the administrative judge should have considered, but she did not expressly evaluate in her decision? Right. On car factor one, it's the Waco-Topeka rivalry. The evidence that, look, he went to an underperforming— In other words, the idea that the Topeka people were hostile to him, but the Waco people loved him. Yes. That's a significant point. And therefore, there's this kind of suggestion of a Topeka conspiracy to see if they could get rid of this guy. And it's not without— That's the basic theory, right? And it's not without— She commented on that. She did not, Your Honors. She addressed— I'm sorry. I found her comment at page 22 of the appendix, I thought, was directed at the whole notion that the Topeka people were hostile to him. Yes. Page 22 was addressing another point. Page 22 was addressing that there were some folks in Waco, not in Topeka, in Waco who didn't get a job that they wanted, some GS-9s who didn't get hired for a position they wanted. So that's sort of 180 degrees. That was not addressing a Topeka bias against him. That was addressing a certain Waco individuals. But just following up on Judge Bryson's good question, it says right here, I've considered the appellant's contention that the allegations set forth in the agency's proposal resulted for a conspiracy among the Topeka employees and that Red failed to properly report the comments. Is that portion not referring to the argument that you just summarized in response to my colleague's questions? Right. But if you look at the previous sentence, it was addressing just because they're Facebook friends, you know, that's the evidence of the conspiracy. And that's not the case. The evidence that we had put forward was that, look, he was a very successful manager for employee satisfaction in Waco, sent to Topeka to fix a massively underperforming  All the allegations come from that office. And if I could add one further point. That's exactly what she said. She said, I have considered the appellant's contention that the allegations set forth in the agency's proposal resulted from a conspiracy among the Topeka employees. Isn't that? That was exactly what I was pointing to. And you say, no, that was all about Waco. Right. But the significant point here is the evidence of the previous paragraph was about Waco. This paragraph was in regard to, you know, supposedly the only evidence of the conspiracy the appellant put forward was that they were Facebook friends. And that's not the case. We have, for example, the fact that there was a false Nazi rumor that was propagated around him. Given the fact that there's time limits on this argument. Did you fully respond to Judge Chin's question? He said he wanted one to two pieces of evidence. I think you've given us one that we've talked about. You've talked about with Judge Bryson. Do you have a second or are you just sticking with the one? I would say the second is the failure on CAR Factor 2 to address the January 2015 reprimand that was in the personnel file. Three months after the AJ's decision in this case, that reprimand, which said that the appellant had made slanderous comments that negatively affected the organization. Three months later, another AJ set aside that reprimand as a WPA violation. So the fact that the AJ here didn't address, well, perhaps that reprimand being in the record that says you made slanderous comments that negatively affect the organization. That could perhaps... Is there any evidence that the proposing official or deciding official knew about the reprimand and the, I don't know, the undoing of the reprimand? Well, it was expunged, again, three months after the AJ's decision in this case. And we cite in our brief... I'm sorry. Can you just answer my question? My question was, is there any evidence in the record that either the proposing official or the deciding official was aware of the reprimand and then subsequent expungement of the reprimand? Well, the expungement didn't happen at the time, but the... Didn't happen at the time of the removal decision. But... Yeah, but there is evidence in the record that the... That Ms. Johnson, who is the recommending official, that she had received copies of... And this is at Appendix 383 of prior disciplinary actions. And so... And we also know, actually, there was a Federal Circuit case from 2020 that came up where the government continued to discuss this reprimand despite settling with the plaintiff and agreeing not to address it to other employers. One thing, you focus on, toward the end of your brief, on procedural errors before the AIB. But it struck me that the AIB is not the agency's adjudicative process. It's an investigative entity, right? And investigative entities, it's effectively equivalent to a grand jury, let's say, in a criminal case. And the kinds of due process considerations that apply to an adjudicative body, either the agency's decision maker, or the, in this case, the board, don't apply, do they, to an investigative entity? Well, I think a distinction is that with grand juries, I mean, that can be sort of ex parte, and maybe the defendant isn't involved in that. But if you look, and this is common ground, at page 12 of the government's brief, it's quoting from the AJA's decision, the agency was, quote, from the employee who is the subject of the investigation. Which they did. They called him in, and he said whatever he had to say. And then subsequently, he was given an opportunity to tell his side of the story to the decision maker, right, in deciding the removal. To Mr. Isaacs, yeah. If I could break that question to two points. The first point, you know, although the AJA says that he was given an opportunity, he had, it was a 23-minute interview. He was not apprised of the specific allegations against him. He said, you know, he was told that there was hostile workplace and sexual harassment, but wasn't apprised of the who, the what, the when, or the where. And then, again, when the investigator was asked about this error, he testified, and this was not captured in AJA's opinion. Whether he was asked or not, I don't think is particularly germane, because my sense is he would have just denied it. That prejudgment of guilt, again, has no place in AJA's investigation. That's not the adjudicator. That's the investigator. Where is it that said that the adjudicator, I mean the investigator, has to do any more than give him an opportunity to speak his piece? Well, if you don't tell him what he's being alleged of doing, he's not able to speak his piece in any meaningful way. That's number one. Number two, the government also, excuse me, the lead investigator, he testified in his deposition that he saw this as more than a fact-finding investigation. He saw this as almost like a court-like proceeding. And I'd submit, Your Honor, you brought up the point that he was allowed, before the decision-maker, after the investigation had already taken place, after it had gone through the recommending official, to present his case before the final decision-maker. The problem is there, it was he had a couple weeks to prepare, compared to the investigative machinery of the state that was able to put together an agency report, interview more than a dozen witnesses under oath, and failed to comply. We submit, and this is, again, page 12 of the government's brief, with the requirement to obtain information from the employee who is the subject of the investigation. You can't do that if you don't tell the employee what he's accused of doing. So what specific relief are you requesting for your client? Can you specifically state what the relief is you're requesting? We request setting aside his removal. At a minimum, we think it's appropriate to, with regard to whistleblower, remand for, with regard to both defenses, it could be to remand to the board to address all the relevant evidence, including countervailing evidence. Again, even if you're not disturbing the underlying findings, there's still, we submit, we've identified issues that the A.J. below did not, neither the board or the A.J. grappled with. So that's one. There's also the point that with the harmful procedural error, there'll be an opportunity, if that's, you know, under this court's precedence, like Ward, the government would be able to pursue removal against him, you know, if it turns out that there was a harmful procedural error. And so that's the remedy that we're seeking, either setting aside his removal outright or remanding to address all the relevant evidence. Thank you, Mr. Kazem. You've used up all of your time and then some, but we will most likely give you two minutes for rebuttal, okay? I appreciate it, Your Honor. Thank you so much. Let's hear from the government. Good morning, and may it please the court. The board properly sustained the removal because there was strong evidence that V.A. would have removed Mr. Oliva regardless of his IRA appeals. That evidence in this case was strong because five women testified credibly that Mr. Oliva engaged in inappropriate conduct on 10 separate occasions in the 2014-2015 timeframe. The administrative judge observed the women testify and found them credible, far more credible than Mr. Oliva's denials. What kind of procedural error that occurs during an investigation in an agency would be serious enough of a procedural error that would warrant undoing not only the board's decision but also the removal decision by a deciding official? It's hard to imagine how some procedural error in an investigatory phase would necessarily compel the conclusion that that would be harmful error. Could there not be a prejudicial kind of procedural error that took place during the investigation? I suppose it's possible, but there's been no showing of that here. What's our case law on that in terms of possible, you know, the possibility that an error that occurs during the investigation is prejudicial and so therefore would warrant undoing the removal decision? Well, I think the closest case that I'm aware of that I could speak on, Your Honor, would be Whitmore. In that case, there was alleged impropriety in the investigatory stage. Witness tampering was the allegation and some other bias or what have you. And in that case, it wasn't the procedural error per se because it hadn't been proven. It was just alleged. But the mere allegation of that called into question the strength of the evidence under CAR Factor I and the agency's motivation to retaliate under CAR Factor II. And in that, those circumstances, this court held that that was all some, those were all evidentiary considerations that the board had to consider in the first instance. And because it was excluded, it was remanded. But if I may finish, it's hard to imagine that just per se, the procedural error in the investigation itself would necessarily amount to harmful error because there's so many other procedural steps. You have the notice of proposed removal. You have the removal decision. Then you have an entire de novo consideration of the evidence by the board. So I think it is an attenuated suggestion. There would have to be a very strong nexus, you're saying, to the CAR factors that would raise questions or raise serious doubts as to the findings under the CAR. I think so. And I think Whitmore is as close as the petitioner is ever going to get on that. But Whitmore is different in a number of respects. First and foremost, as I believe the question, the discussion before, acknowledged that this administrative judge never actually excluded Dr. Russell. She, on page 1022 of the appendix, approved Dr. Russell for testimony in this matter. And then at 1028 of the appendix, Mr. Oliva, through his prior counsel, withdrew that designation of the witness. After the administrative judge said, I don't really think it's relevant. So you could view, as they do, the act by counsel as being acquiescence into a ruling by the judge. Maybe they could have been more robust in pushing back. But it seems to me the only argument on that front, or at least the strongest argument you have, is that she came back and said, well, if you want to re-urge Dr. Russell, I'm open to that. And he did not pursue that. There really is a dual problem with the failure to preserve that issue. The administrative judge excluded two witnesses, neither of whom was Dr. Russell, on page 1022 of the appendix. Interpreting that ruling, Mr. Oliva's prior counsel withdrew Dr. Russell, even though he had been approved. And so that's problem number one, failure to preserve the argument. Number two, at page 343 of the appendix, the administrative judge said, OK, you want to withdraw? I agree. We're going to withdraw that witness from approval. But if anyone thinks that it's necessary for their case, tell me and I'll consider it. And yet Mr. Oliva never came back, never requested a ruling, and never had that witness excluded. I mean, the essence of preserving an issue is to advance it and have it rejected. And that was never done. What is the state of Mr. Oliva's knowledge of the charges against him at the point of the investigation? That's my first question. The second question is, at what point was he given the list of specifications? I do not know, standing here today, everything that he knew at the investigatory stage, but certainly— The opposing counsel said he didn't know anything. He wasn't told anything other than the most general characterization of sexual harassment. Is that true or not? I didn't see anything in the record. And there really wasn't, so far as I could tell, in the briefs much, if anything, said on that point. But I really would be interested in knowing, to the extent that we can get to it, how we could figure that out and where we would look. I am at the same disadvantage, Your Honor, because the record does not answer that question. And so I cannot really comment intelligently on that because I don't have a record on that. So, Mr. Oliva, just following up on that, I guess one of the key arguments we heard today is that Dr. Russell had indicated that it was to no good use to ask Mr. Oliva specific questions about these specifications because he just would have denied them. And that suggests some kind of preordained view that, in fact, he was—that he actually did commit those misconduct allegations. Oh, I don't think so at all, Your Honor. And the final point on it, therefore, this is something that an administrative judge needed to address but did not. No, well, I have several answers to that question. But just as a matter of sequence and timing, there were not specifications in existence until the notice of proposed removal, which came after the entire investigatory phase had concluded. Then, subsequently, during the board proceedings in the process of discovery, there was a deposition of Mr. Russell. And he was asked, well, would it have made any difference to go through point by point and get into all these factual issues with Mr. Oliva? And Mr.—I'm sorry, Dr. Russell, who had observed Mr. Oliva's demeanor and tenor during his 25, 30-minute submission before the investigatory board, saw a person who was denying everything and felt he did nothing wrong. And so it was hard for Dr. Russell to imagine, well, what would have been the point? He could have done more. You could always say that. The administrative judge could have written more. But she did say, not once, not twice, but three times, that she considered the totality of the evidence in making her credibility assessments. Now, it appears that there was at least some information in Mr. Oliva's—do you know if it's Oliva or Oliva? We're using both pronunciations. Do you happen to know which is correct? Maybe— I would defer to my friends, Mr. Kazama, about that.  Oliva? Okay. Mr. Oliva has asked about whether—and this is in the investigative interview, as I understand it—whether he ever made a statement to an employee that the employee was no better than the spawn of a rape victim, which is a specific allegation, and he denies it. Now, I don't know, having looked through his testimony before the AIB, there were a couple of other references in general, but nothing specifically identifying the complaining witnesses or anything else. I didn't see that in the questioning that was done against him. So the suggestion is that either the investigative board was not confronting him with the specificities of the charges or that it was being pretty general in the way that it approached him. Would you say that's a fair characterization? Again, I'm at a disadvantage because I don't know what Mr. Oliva saw in advance of that interview at the investigative stage, but I do think that there's a larger point here that I'd like to make, which is, okay, the investigation was the investigation, but then Mr. Oliva received a notice of proposed removal. And with that notice, did he get all of the specifications? Yes. Yes, indeed. All 10 specifications are set forth in the notice. And then, before his removal, he was allowed to give an oral statement. This was an oral statement for the ages. I've never in 17 years of almost 18 years of government practice, I've never heard of an employee getting a five-hour oral rebuttal to all the charges. This petitioner had plenty of due process throughout. And then at the board stage, he was able to present copious evidence he testified at length regarding every single one of these specifications, and it all came down to credibility. Do you know if there is any other agency, I mean, typically, let me back up, typically in these kinds of processes, to my knowledge, the investigation is very informal. Maybe somebody has been asked to talk to X, Y, or Z, and then a recommendation is made to a higher-up who issues, if the higher-up thinks it's actionable, a notice of proposed removal or sanction. And then, at that point, there is, as you were describing, a process that includes notice, an opportunity to be heard, and an opportunity frequently to be heard in person, and with the assistance of counsel. Yes, and he received all of that due process, and so it's hard to imagine how anything that happened in the investigation could be a harmful procedure. My question really is, do you know of any other agency that has this precursor investigative process, such as the AIB, that's much more elaborate than the one individual appointed to go talk to a few witnesses and make a recommendation as to possible action? I know it's true in the VA. I don't know if it's true anywhere else. I have heard in my travels that the State Department has a rather robust investigatory process, but I'm really not able to comment, you know, government-wide. Am I right in thinking that, in most instances, the investigative process is very informal, more informal than what's laid out in— Generally speaking, yes, and there's been no pointing to, you know, a binding regulation that would entitle him to more than the extensive due process that Mr. Oliva received. So, counsel, a couple of questions for you. One, can you give us specific JA sites that help support up the argument that you were making to us about the extensive process he received? Like, you've got specific JA pages that you could say right now, to that effect, that would be helpful. And then my second question is just to follow up on what you've been talking about, the considerable—well, opposing counsel has been talking about considerable countervailing evidence that was not, in his view, considered by the AJ. If you could respond to that as well, those would be the two questions I need answers to. Sure. As for JA sites, we've got those in our brief. I don't have those at the top of mind. Is the five-hour theme covered in— I believe so. I believe so. As far as Mr. Oliva arguing, his main arguments are everything is he said, she said, and the administrative judge was ignoring all of his evidence.  Neither of those is a good argument. As far as he said, she said, the argument is, well, these witnesses should have been deemed less credible or the evidence was less strong because it was he said, she said. But that would require this court to reassess the credibility of those witnesses or reweigh the evidence, and that's not what the standard of review allows. It's not he said, she said. It's he said, they said. Exactly. That was my next— You have five different people. Yes, that's my next— That multiplies the likelihood that they're not all lying, unless you accept the Topeka conspiracy theory. Which the judge addressed, and it was with—she found that to be incredible. Waco people that didn't like him. Perhaps. Well, he didn't promote certain people, and then the theory goes there were a bunch of disgruntled GS9 employees because he didn't give the promotion to the right people. Right. And he said, she said. The fundamental problem with it, as Judge Bryson just alluded to it, is that it falsely equates credible testimony from five women with his less credible denials. And the administrative judge was entitled to look at these five courageous women who came forward to report Mr. Oliva's behavior and testify about very uncomfortable circumstances. Inappropriate conduct was the charge. That's putting it mildly. I won't get into exactly what it is. The court already knows, but this employee had to be removed. This cannot be the conduct that's acceptable in the federal government ever. I can't recall if Judge Cunningham had another question for you to respond to, but I do just want to jump in on this question of he said, she said, and the clear and convincing standard of proof. What if there was only one witness? And so it's not a he said, they said. It really boils down to a he said, she said. And there's no corroborating evidence. Can that still be enough for clear and convincing evidence? I think it would have to come. So what case law tells us that? I don't think we have that case on point, Your Honor. But I would say this case is about as far from that as you could imagine. So I don't think the court needs to go there. Because in this case, the women's, the five women who testified, their testimony was corroborated by contemporaneous notes, by reports to agency managers, by other witness testimony, by Mr. Oliva's own admissions, and by prior witness statements. And so as the trier of fact, the administrative judge was entitled to evaluate witness demeanor and credit their sworn accounts, most of which was corroborated. If we just zoom out out of the 10 specifications, only two specifications E and H were proven with testimony that was deemed credible, but not corroborated. So the administrative judge properly concluded based on credible and corroborated testimony for eight of the specifications that VA's evidence in support of the charge was strong overall. And as for the argument, Judge Cunningham, that you had asked about ignoring the evidence and Mr. Kazam's argument that we're just relying on a presumption that all the evidence was considered. Of course, there's a presumption, but we don't even need that here. Because the administrative judge said three times on pages 23, 25, and 53 of the appendix that she considered the totality of the evidence in making her credibility assessments. And there is nothing in this record that has been pointed to, to suggest that she purposefully disregarded any of Mr. Oliva's evidence. And so for these reasons, the VA properly removed Mr. Oliva. He has failed to demonstrate any error in the careful and thoroughly considered opinion below, and the court should affirm. We'll stand on the briefs. Thank you. Thank you. We'll give Mr. Kazam three minutes. Thank you, Your Honor. Your Honors, I'll start off with the harmful procedural error defense, because I think that defense is really critical. And it's key here, it's important to recognize here that Mr. Oliva, the appellant, was not apprised of the allegations against him. He was not apprised of the who, the what, the when, the where. He manages over 500 employees, but he was not given this information in order to identify investigative avenues, interview leads that the agency could have pursued, such as, for example, speak. Where in your brief do you raise this? Because I didn't remember this as being an issue that you particularly flagged. I mean, maybe it was mentioned in passing, but the fact that he was not given sufficient information in advance of the action of defense. Right. And we address, for example, on page 53 to 54 of our opening brief, the AAB investigators largely failed to ask Mr. Oliva about the misconduct alleged against him. That's not talking about his lack of information. Well, thus impeding his ability to provide a full and complete defense. No, but that's focusing on their failure to ask him questions, which it seems to me is kind of pointless. I mean, he had an opportunity to speak to this, but what you don't say here as far as I can see is, and he didn't have information about what he was being charged with or what the allegations were. Right. You say that anywhere, either in hyperbole or in effect. Right. Again, I'd point most particularly to page 53 and 54 of the brief, because I think that highlights that Mr. Oliva did not know the charges against him. And again, it's not a matter of putting a negative. It doesn't say that, but you will agree that it does not say that. It says that they failed to ask about the facts underlying the specifications, but that doesn't mean he wasn't aware of what either in general or specifically the charges were. Right. And I think I'd point to, you know, any evidence that's in the record is an email from the lead investigator where he flags, we're looking into a hostile work environment and sexual harassment, but there's not any discussion of, you know, the allegations of who made the allegations. And so the AIB did ask about a couple of particular, I don't know what to call these whoppers of accusations against them. Well, there were 10. At the bottom of the rape language and the who you know business. Right. But there were 10 allegations. They asked two in general terms and without knowing, for example, who made the allegations when they were made, you know, Oliva raises, for example, with respect to the, you know, one of the comments that he was not, he had produced travel records in the AJ proceedings. He wasn't, he didn't have an opportunity in the AIB investigation to show that he wasn't in Topeka at the time that those allegations were made. And this just goes to a larger point that, again, the right, it's not just the whistleblower to provide his defense before the final decision maker. It's, it's, the agency is supposed to speak with the, with the, with the employee so that the agency can collect material information, can either confirm or refute. Do you have a final point? Yes, Your Honor. Again, we respect that, you know, reverse or at minimum blocker is warranted so that, you know, the AJ can address in the first instance, the harmful procedural error and the lack of information that Mr. Oliva was given to him. And then with respect to the clear and convincing defense, again, the standard is you have to provide under Whitmore, under Smith in-depth discussion and full discussion of the facts that accounts for all countervailing evidence that did not happen here. Thank you, Your Honors. The case is submitted.